656 S.E.2d 121

**STATE of West Virginia, Plaintiff Below, Appellee**

v.

**David FARRIS, Defendant Below, Appellant.**

**No. 33314.**

Supreme Court of Appeals of West Virginia.

Submitted Oct. 24, 2007.

Decided Nov. 21, 2007.

Dissenting Opinion of Justice Benjamin Dec. 20, 2007.

Darrell V. McGraw, Jr., Attorney General, R. Christopher Smith, Assistant Attorney General, Charleston, for Appellee.

M. Timothy Koontz, Esq., Williamson, for Appellant.

PER CURIAM:

The appellant, David Farris, was indicted by the grand jury of Mingo County at the September 2005 term of court on two counts of sexual abuse by a guardian under *W. Va.Code*, 61–8D–5(a) [2005], and two counts of first degree sexual assault under *W. Va. Code*, 61–8B–3 [2000]. On September 22, 2005, the appellant plead not guilty to all charges in the indictment. Before the trial commenced the appellant filed an Omnibus Motion for discovery which included a specific request for "Exculpatory Material under *Brady v. Maryland.*"[1] On January 4, 2006, after completion of pretrial proceedings, the case came on for a jury trial. That trial ended in a mistrial.

On January 31, 2006, a second jury trial was commenced. The next day, February 1, 2006, the jury returned a verdict against the appellant of guilty on all four counts as contained in the indictment. On February 8, 2006, the trial court entered an order adjudging the appellant convicted of the four counts. After the trial was concluded, and before sentencing, the appellant filed a motion for a new trial, based primarily upon the failure of the State to disclose a forensic

---

1. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

examination report prepared by a State's witness, Robin Brozowski, a Kentucky forensic psychologist, in connection with a forensic examination of Barbara R.,[2] an eleven year old cousin of the appellant. The trial court denied the appellant's motion. On May 30, 2006, the trial court sentenced the appellant. It is from the trial court's May 30, 2006 order that the appellant appeals.

For the reasons stated *infra*, we reverse.

## I.

The charges against the appellant stem from allegations made by two minors, Autumn B. and Shannon B., that the appellant committed the sexual offenses against them in September of 2004, while the appellant and his wife were babysitting Autumn B. and Shannon B. in Mingo County, West Virginia. The two alleged victims are sisters and were ages ten and nine, respectively, at the time of trial in 2006. The alleged victims did not report the claims of abuse until November 1, 2004, when they related the allegations to their mother, Joyce Spradlin. By this date the mother and two daughters had moved from West Virginia to Kentucky; therefore, the mother reported the alleged abuse to the Kentucky State Police. It was reported on the same day the girls told their mother.

Later the same evening Joyce Spradlin learned that the Kentucky State Police could not handle the investigation because the incident allegedly occurred in West Virginia, not Kentucky. The next morning Mrs. Spradlin contacted Roby Pope, Jr., Chief of Police in Williamson, West Virginia. Chief Pope took charge of the investigation.

As a part of the investigation Chief Pope referred the case to the Department of Health and Human Resources ("DHHR") in Williamson, West Virginia. With the assistance of the DHHR, forensic interviews of

the alleged victims were scheduled at the Big Sandy Child Advocacy Center in Pikeville, Kentucky.

On November 16, 2004, Autumn B. and Shannon B. were interviewed by Nettie Goan, child protective service worker with the Mingo County DHHR. Several months later on March 22, 2005, Autumn B. and Shannon B. were also interviewed by Robin Brozowski, forensic psychologist with the Child Advocacy Center in Pikeville, Kentucky. Chief Pope observed both the interviews conducted by Nettie Goan and the interviews conducted by Robin Brozowski from a remote location.

During interviews with both Nettie Goan and Robin Brozowski the alleged victims mentioned another child, Barbara R., a minor cousin of the appellant, as a possible victim of abuse by the appellant. The record in the second trial suggests that Barbara R. may have been present when the claimed abuse of Autumn B. and Shannon B. occurred.[3]

On December 22, 2004, prior to interviewing Autumn B. and Shannon B., Robin Brozowski conducted a forensic examination of Barbara R. Unknown to defense counsel at the time of either trial, a written report had been prepared by Ms. Brozowski in connection with her forensic examination of Barbara R. The report included the following:

> Child [Barbara R.] reported, "It was said that David [Appellant] molested me ... my cousin David ... but he didn't." Child reported Joyce [mother of Autumn and Shannon] told her to "go along with the story" that David molested her or that she would make sure that she (child) was taken from her mother. Child reported she did not know "if she [mother of Autumn and Shannon] threatened her two girls or not." Child further described "the story" as "like he tongued me and stuff." She described

2. Due to the sensitive nature of the facts involved in this case, we will adhere to our usual practice in such matters and refer to the parties by their first names and last initials only. *See In re Clifford K.*, 217 W.Va. 625, 619 S.E.2d 138, (2005).

3. The testimony in the second trial by Nettie Goan, child protective service worker, states, in part, as follows:

> Q. [Defense counsel] Are you aware based upon what the girls stated in their interview if there were any other people in the home that evening?
> A. [Nettie Goan] A cousin, I think; David's [Appellant's] cousin, Barbara R[.]

"tongued" further as "he just licked me is what the story was suppose to mean." Child also reported touches did not happen to her but that "I don't know about Autumn and Shannon." Child reported Shannon "stuck a toothbrush up inside her (Shannon)." Refer to taped interview for additional information.

The report of the examination of Barbara R. by Ms. Brozowski also indicates that the: "Child appeared competent related to knowledge of truth and lie: Yes $\underline{X}$ No ____."

On cross-examination during the first trial, Ms. Brozowski stated that Barbara R. was mentioned by Autumn B. and Shannon B. as being present when the alleged abuse occurred. Ms. Brozowski agreed that she had interviewed Barbara R., but did not provide information during her testimony that she had prepared a written report of her interview.[4]

At no time after Ms. Brozowski testified for the State, and prior to the conclusion of the first trial, did the State make any effort to disclose to defense counsel the Barbara R. information referenced by Ms. Brozowski during her testimony with respect to her forensic examination of Barbara R. Nevertheless, during the first trial, defense counsel offered eleven year old Barbara R., as a witness. The trial court conducted a hearing in camera to determine whether Barbara R. was competent to testify, following which the trial court ruled that she was not competent to testify. Defense counsel did not have the benefit of material that is now known to have existed at the time he conducted his examination of Barbara R.—Ms. Brozowski's written report and tape of her interview with Barbara R.

During the second trial defense counsel did not offer Barbara R. as a witness, relying

---

4. The following exchange occurred during cross examination in the first trial:

Q. [Defense counsel] Do you recall that both Autumn and Shannon [B.] identified another little girl who was present, a Barbara R[.]?

A. [Brozowski] In one of the notes one of the standard questions would be other kids there and the other kids that would have been and they did give Barbara R[.] and then I added parenthesis, a cousin, so Autumn identified Barbara R[.] as a cousin and they identified that Tina Farris was also there.

Q. [Defense counsel] Do you recall during your forensic interview a Barbara R[.]?

A. [Brozowski] Yes.

Q. [Defense counsel] Did you find her to be credible?

MS. Maynard: Objection, Your Honor. I wasn't aware there was a forensic interview of Barbara R[.]. I've not been provided with copies of transcripts.

THE COURT: Approach.

(Bench Conference)

MS. MAYNARD: Your Honor, I would object to this line of questioning.

MS. VANZANT: Your Honor, I believe this witness will testify as to the credibility of Barbara R[.].

MS. MAYNARD: I don't think she'll say that.

THE COURT: Let's get away from that. It wasn't provided.

(Bench conference concluded)

Q. (Ms. Van Zant continuing) Did you make any findings whether or not Barbara R[.] had been assaulted?

A. (Witness continuing) I don't have that information with me, in front of me. I would have to have it in front of me in order to testify.

On redirect examination, the prosecutor questioned Robin Brozowski as follows:

Q. [Prosecutor] Now, I want to talk to you a little bit about Barbara R[.]. Do you know when you did an interview with Barbara R[.]?

A. [Brozowski] Like I said, no; I do remember Barbara's name because it's on the tape and the kids indicated that she was three [sic]; however, any details—I know they specifically mentioned each other. Shannon and Autumn mentioned her and she mentioned them. That's about the extent to what I have without having something to refer to and without listening to the tape again.

Q. [Prosecutor] Do you remember specifically any red flags or concerns you had as you interviewed Barbara R[.] or do you have any recollection?

A. [Brozowski] I would need that here in order to be correct and answer correctly. I would rather listen to the tape first before I answer any question regarding Barbara. It has been a while. I don't remember the date I interviewed her, but it has been a while—I believe it was in March.

Q. [Prosecutor] My last question; Were you able to determine based upon your interviews whether Barbara R[.] was actually at the house at the time that this abuse occurred to Autumn and Shannon [B.] or whether she was there on another occasion?

A. [Brozowski] No. In each of Autumn and Shannon's tapes they mentioned Barbara and that Barbara was there, but then at other times it would have been just David and Tina, so I don't get a clear indication of the time period or whether or not Barbara was there or if it was on different days.

upon the court's finding during the first trial that she was not competent to testify. Ms. Brozowski's testimony during the second trial suggested that Barbara R. was another possible victim of sexual abuse by the appellant.[5] Still, at no time during her testimony did Ms. Brozowski reveal the existence of her written report in connection with her examination of Barbara R. Furthermore, prior to the second trial the State did not disclose to defense counsel Ms. Brozowski's written report of her examination of Barbara R.

The record reveals that it was not until after February 14, 2006, after the conclusion of the second trial, that defense counsel obtained a copy of Ms. Brozowski's written report of her forensic examination of Barbara R. The Brozowski report of the examination of Barbara R. was ultimately obtained pursuant to a Pike County, Kentucky Circuit Court order.

On appeal, appellant contends that because of the after-trial discovery of the report, he should be awarded a new trial primarily based upon the theories of newly-discovered evidence and upon a violation of *Brady, supra*.

## II.

 In Syllabus Point 4 of *Burgess v. Porterfield*, 196 W.Va. 178, 469 S.E.2d 114 (1996) this Court held:

This Court reviews the circuit court's final order and ultimate disposition under an abuse of discretion standard. We review challenges to findings of fact under a clearly erroneous standard; conclusions of law are reviewed *de novo*.

With these principles in mind we proceed to consider the appellant's appeal.

We begin with an examination of the appellant's claim that the failure of the State to disclose to the appellant the written report of

Robin Brozowski made in connection with her forensic examination of Barbara R. was a violation of *Brady, supra*, and constitutes reversible error. In order to resolve this issue we need only look to our recent decision in *State v. Youngblood*, 221 W.Va. 20, 650 S.E.2d 119 (2007) and cited authorities.

 In Syllabus Point 1 and 2 respectively of *Youngblood* we held:

A police investigator's knowledge of evidence in a criminal case is imputed to the prosecutor. Therefore, a prosecutor's disclosure duty under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *State v. Hatfield*, 169 W.Va. 191, 286 S.E.2d 402 (1982) includes disclosure of evidence that is known only to a police investigator and not to the prosecutor.

There are three components of a constitutional due process violation under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *State v. Hatfield*, 169 W.Va. 191, 286 S.E.2d 402 (1982):(1) the evidence at issue must be favorable to the defendant as exculpatory or impeachment evidence; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must have been material, i.e., it must have prejudiced the defense at trial.

 The appellant, in part, urges that the investigation in this case was a joint investigation between law enforcement authorities in West Virginia and Kentucky authorities and that because it was a joint investigation, the Kentucky authorities became part of the prosecution team. The appellant further argues that because the Kentucky authorities were acting on the behalf of the West Virginia law enforcement authorities, the knowledge obtained by the Kentucky authorities should be imputed to the prosecutor. We agree.

5. Following is an excerpt from the trial transcript of the second trial, January 31, 2006:

Q. [Defense counsel.] Did the girls identify any other children or adults who may have been present during these alleged acts?

A. [Brozowski] I have their information on the checklist "Others present when abuse occurred," Shannon reported Autumn and Tina were there. Autumn, her sister, and Tina Farris. "Names of other possible victims as given by child," she named, again, her sister, Autumn [B.], and she named another person named Barbara R[.], who she also—they referred to as Boo, as well.

Q. [Defense counsel] Did the other girl, who did she reveal was there?

A. [Brozowski] Okay; Autumn revealed that Shannon, her sister, was there, and Tina Farris was there. "Names of other possible victims as given by child," Shannon, her sister, and Barbara R[.].

In criminal proceedings the State is obligated to turn over documents and other matters in its possession, custody or control, if requested by a defendant pursuant to Rule 16 of the *West Virginia Rules of Criminal Procedure.* The record in this case discloses that the appellant filed a motion under Rule 16 requesting that the State turn over to him

... any and all exculpatory material, and any and all evidence material to the preparation and/or presentation of a defense against the matters charged or which might lead to evidence which might aid in the defense of the matters charged, and all materials generally described as 'BRADY' materials. *Brady,* [supra]. . . .

There is no dispute, notwithstanding the appellant's discovery request, that the State failed to turn over the forensic report prepared by Robin Brozowski in connection with her examination of Barbara R.

As we explained in *Youngblood, supra:*

It is not relevant under *Brady* and *Hatfield* that the police, rather than a prosecutor, had knowledge of material evidence that was favorable to a defendant. The United States Supreme Court addressed this point in *Kyles v. Whitley,* 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995): "[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police. But whether the prosecutor succeeds or fails in meeting this obligation, the prosecutor's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable."

*State v. Youngblood,* 221 W.Va. at 26, 650 S.E.2d at 125.

*Youngblood, supra,* recognizes that "[t]he decision in *Kyles* stands for the proposition that 'it is proper to impute to the prosecutor's office facts that are known to the police and other members of the investigation team. *United States v. Wilson,* 237 F.3d 827, 832 (7th Cir.2001).'" *Youngblood,* 221 W.Va. at 26, 650 S.E.2d at 126.

As previously noted, Nettie Goan, child protective service worker with the DHHR in Williamson, West Virginia, at the request of Williamson Chief of Police Pope, scheduled Autumn B. and Shannon B. for forensic examinations to be conducted in Pikeville, Kentucky. Subsequently, Robin Brozowski conducted a forensic examination of both of the alleged victims and later testified at trial about her findings. Ms. Brozowski also conducted a forensic examination of Barbara R. and testified at trial about the examination. Ms. Brozowski conducted her examinations at the Big Sandy Area Child Advocacy Center Kentucky at the request of the West Virginia prosecution team. As such, Ms. Brozowski became part of the prosecutor's investigation team. Therefore, the knowledge which Ms. Brozowski obtained with respect to her examination of Barbara R. would be imputed to the West Virginia prosecuting authorities. *See* Syllabus Point 1 of *Youngblood, supra.*

However, simply finding that the evidence obtained by Ms. Brozowski related to the instant case and that it is imputed to the prosecuting authorities does not end the inquiry. We must next determine whether the three components of *Brady, supra,* as set forth in Syllabus Point 2 of *Youngblood, supra,* were met.

■ The first component of *Brady, supra,* requires that "the evidence at issue must be favorable to the defendant as exculpatory or impeachment evidence." From our examination of the record, we believe the report prepared by Robin Brozowski in connection with her examination of Barbara R. and the statements made to Ms. Brozowski by Barbara R. could be favorable to the appellant in this case, either as exculpatory or as impeachment evidence, or both. The report and statements made to Ms. Brozowski by Barbara R. tend to contradict and impeach the testimony of the alleged victims. Furthermore, the report and statements tend to support the appellant's testimony that he did nothing wrong and that the mother of Autumn B. and Shannon B., Joyce Spradlin, told Autumn and Shannon to lie in order for the mother to "get back at" the appellant for breaking off an affair. Finally, the evidence provides an alternative explanation for the physical evidence and expert opinion that one of the girls had been vaginally penetrated. For these reasons we find the first component of *Brady, supra,* satisfied.

The second component of *Brady, supra,* requires that "the evidence must have been suppressed by the State, either willfully or inadvertently." We find nothing in the record to suggest that the prosecutor acted willfully in suppressing the report prepared by Ms. Brozowski. In fact, the contrary appears to be true as demonstrated by the prosecutor's expression of surprise during the first trial when Ms. Brozowski's examination of Barbara R. was being explored on cross examination. Willful suppression of evidence, however, is not required to satisfy the second *Brady* component. Suppression of evidence may occur through inadvertence by the prosecutor and still satisfy the second component of *Brady, supra.*

We believe that the prosecutor had enough information about the significance of Barbara R. to appellant's defense prior to the first trial to invoke the *Brady, supra,* disclosure principles. Barbara R. was mentioned by both Autumn B. and Shannon B. during their forensic examinations by Ms. Brozowski, examinations that were witnessed by Chief Pope, the West Virginia authority who took charge of the investigation in this case. Even if the prosecutor was not aware of Ms. Brozowski's forensic examination of Barbara R. or her written report before the first trial, the prosecutor was put on notice of the Barbara R. examination when the matter came up during the first trial. Following the declaration of a mistrial (first trial) and before the commencement of the second trial, the prosecutor should have pursued the matter so that the full extent of the forensic examination of Barbara R. could be known and disclosed to the appellant. Even though defense counsel possessed the same information as the prosecutor as a result of Ms. Brozowski's testimony at the first trial, the prosecutor is not excused from the obligation to provide disclosure of *Brady, supra,* material. We therefore find that the second component of *Brady, supra,* is satisfied.

The final component of *Brady, supra,* requires that "the evidence must have been material, i.e., it must have prejudiced the defense at trial." Here, it is helpful to examine at our analysis in *Youngblood, supra,* where we stated that:

[t]his Court has recognized, along with the United States Supreme Court, that " [t]he evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine the confidence in the outcome.' " *State v. Fortner,* 182 W.Va. 345, 353, 387 S.E.2d 812, 820 (1989) (quoting *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985)). Additionally, it has been said that "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Kyles,* 514 U.S. at 434, 115 S.Ct. at 1565. All that is required is a "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435, 115 S.Ct. at 1566. Finally, the suppressed evidence "must be evaluated in the context of the entire record" *Agurs,* 427 U.S. at 112, 96 S.Ct. at 2402.

*Youngblood, supra,* 221 W.Va. at 32, 650 S.E.2d at 131.

We find the trial court's findings and conclusions regarding the importance of the Browkowski report to the appellant's case as significant. The trial court made the following observations in its order denying the appellant's motion for a new trial:

The Court agrees with the Defendant that the report is not cumulative under *Kennedy, Id.* [*State v. Kennedy,* 205 W.Va. 224, 517 S.E.2d 457 (1999)] The report contains information that could potentially be used for several purposes, including impeachment of the victims, Autumn B. and Shannon B., providing an explanation or defense to the physical evidence, and could attack the conclusions of the experts in this matter, vis-a-vis the credibility of the minor victims.

. . .

The proffered evidence contains two items that could be used to bolster Mr. Farris's [appellant's] defense, specifically, the "child reported Joyce told her to 'go along with the story' that David [appellant] mo-

lested her or that she would make sure that she (child) was taken from her mother," and Child reported Shannon "stuck a toothbrush inside her (Shannon)." Report of Dr. [sic] Brozowski.

We agree with these findings of the trial court, but would go further. It is not necessary for us to find that the Brozowski report would be such that its use at a new trial ought to produce an opposite result as was determined by the trial court; the trial court was considering the appellant's motion based upon the ground of newly-discovered evidence, and not *Brady, supra,* violations. We conclude that the trial court's findings with which we agree constitute a sufficient basis for this Court to hold that this evidence is sufficient to qualify as favorable evidence which "could reasonably be taken to put the whole case in such a different light as to undermine the confidence of the verdict" as required by *Brady* and *Youngblood, supra.* Accordingly, we find that the third component *of Brady, supra,* has been met.

Inasmuch as our findings relating to the appellant's assignment of error for *Brady, supra,* violations form a basis for reversal, we find it unnecessary to consider any of the appellant's other assignments of error.

### III.

Based upon the foregoing, we reverse and remand the case for a new trial.

Reversed and Remanded.

Justice MAYNARD dissents and reserves the right to file a dissenting opinion.

Justice BENJAMIN dissents and reserves the right to file a dissenting opinion.

BENJAMIN, Justice, dissenting:

(Filed Dec. 20, 2007)

Assumed facts not in the record should not trigger the ordering by this Court of a new

trial. Unfortunately, as in this Court's recent majority decision in *State v. Youngblood,* 221 W.Va. 20, 650 S.E.2d 119 (2007), I believe the majority has again leapt to factual conclusions not borne out by the record before us and, relying on such presuppositions, has prematurely, and perhaps erroneously, ordered a new trial below. Accordingly, I dissent.

To reach its conclusion, the majority must assume that there was a *joint* investigation by Kentucky and West Virginia authorities herein, thereby permitting an imputation of knowledge of Kentucky authorities to West Virginia authorities.[1] For only if there was a joint investigation is there the potential that the knowledge of information contained in the file of a Kentucky forensic psychologist may be imputed to a West Virginia prosecutor under *Youngblood.*[2] However, no evidentiary hearing was held below to determine whether there was such a joint investigation. The trial court made no factual finding that West Virginia officials were ever engaged in a joint investigation with Kentucky authorities on the allegations against Mr. Farris. Furthermore, there is no factual finding by the trial court that Robin Brozowski, a forensic psychologist with the Child Advocacy Center in Pikeville, Kentucky, was a police investigator or part of the investigative team in this matter. To reach an analysis under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the majority simply *assumes* that there was a joint investigation into the allegations against Mr. Farris by West Virginia and Kentucky authorities, and further assumes Ms. Brozowski's role therein.

This assumption by the majority that there was a joint investigation and Ms. Brozowski's

---

1. The majority's rush to order a new trial herein typifies the same error in judging which I believe was also present in the majority's decision in *Youngblood* when, in that case, the majority readily accepted as authentic an unauthenticated document with an exceptionally suspicious governance and, accepting the highly questionable document as absolutely authentic, used that document to order a new trial.

2. In Syllabus Point 2 of *Youngblood,* this Court held: "A police investigator's knowledge of evidence in a criminal case is imputed to the prosecutor. Therefore, a prosecutor's disclosure duty under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *State v. Hatfield,* 169 W.Va. 191, 286 S.E.2d 402 (1982) includes disclosure of evidence that is known only to a police investigator and not to the prosecutor."

role therein is critical to the majority's decision herein because without this assumption a *Brady* analysis is not triggered. I would instead remand this matter to the trial court to conduct an evidentiary hearing and make factual findings on whether there indeed was a such a joint investigation and, if so, Ms. Brozowski's role in such an investigation.[3] Only if the trial court were to make the requisite factual findings that there was such a joint investigation and that Ms. Brozowski was a part of such an investigation would the issue of a new trial be triggered. ·

By remanding this case, the trial court would have the opportunity to conduct the initial *Brady* analysis, an analysis which is often fact-intensive and therefore not conducive to an appellate determination.[4] Our role on appeal should be one of review, not determination in the first instance. In addition to determining whether a joint investigation between both jurisdictions took place, other facts could be determined by the trial court, such as Ms. Brozowski's *actual* role in the investigation, Mr. Farris' ability to obtain the report other than through the Mingo County prosecutor's office, and the significance of the report to the defense. The trial court, having already sat through two trials in this matter, is in the best position to determine the significance of the report to the defense and should have been afforded the opportunity to make the requisite factual findings and conduct the initial *Brady* analysis.

Before this Court should jump to the conclusion that a trial court got it wrong, we should ensure that the record actually establishes that the trial court did get it wrong. Here, that is not the case. Unless the majority, as a matter of law, proposes to impute knowledge of an independent criminal investigation by a foreign jurisdiction to West Virginia authorities, we should not vacate a criminal conviction absent some certainty of actual error below.[5] By prematurely accepting as fact something which is clearly not a fact, as it also did in *Youngblood,* the majority has improvidently ordered a new trial herein based upon supposition, not on facts within the evidentiary record. Accordingly, I dissent.

I am authorized to state that Justice MAYNARD joins in this dissent.

---

3. It is apparently undisputed that the prosecutor was unaware of the existence of the report before trial. Based upon Ms. Brozowski's testimony at the first trial, the prosecutor may have had an obligation to inquire as to the existence of this evidence. However, because that issue was not addressed by the majority nor served as a basis for the majority decision herein, I withhold a definitive opinion on that issue.

4. I would also note that the potential existence of a report and knowledge of Ms. Brozowski's interview with Barbara R. was apparently known to Mr. Farris and his counsel prior to his first trial. As such, Mr. Farris could have obtained the report pursuant to subpoena through the Kentucky court system if he believed the same to be truly that critical to his defense.

5. One is left to ponder whether the knowledge of federal authorities developed in a separate investigation may now be imputed to West Virginia prosecutors simply because the same issues may have been present in both federal and state investigations of a given defendant. It is my hope that this Court will, in the future, practice some what more restraint when determining matters with important factually-intensive issues and underdeveloped records.